# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EVANGELINA PEARSON,

        **Plaintiff**,

v.

KANSAS DEPARTMENT OF
CORRECTIONS,

        **Defendant**.

Case No. 23-2288-DDC

## <u>MEMORANDUM AND ORDER</u>

Drama sometimes festers at work. And the court has no role in sorting out garden-variety workplace disputes. But when disagreements and drama transform into discrimination against protected classes, an issue for the court arises.

In this case, plaintiff Evangelina Pearson alleges that her employer, defendant Kansas Department of Corrections, unlawfully discriminated against her on the basis of her sex. She claims that one of her supervisors singled her out and imposed unwarranted discipline. Defendant disagrees, arguing that it didn't take any adverse employment action against plaintiff and that plaintiff's sex didn't animate its actions. Now, defendant has filed a Motion for Summary Judgment (Doc. 35). Plaintiff responded (Doc. 36), and defendant replied (Doc. 39). The court grants defendant's Motion for Summary Judgment (Doc. 35), and explains its reasons, below.

## I.      Background

The following facts either are uncontroverted or, if controverted, are construed in a light most favorable to plaintiff. *Scott v. Harris*, 550 U.S. 372, 378 (2007) ("[C]ourts are required to

view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." (quotation cleaned up)).

### Plaintiff's Employment and Defendant's Structure

Plaintiff is a single mother of three children, ages 25, 21, and 11. Doc. 36-10 at 2 (Pearson Dep. 10:11–16); Doc. 36-2 at 1 (Pearson Aff. ¶ 1). She has worked for defendant—at the Lansing Correctional Facility (LCF)—since January 2004. Doc. 36-10 at 2 (Pearson Dep. 6:14–17); Doc. 36-7 at 1 (Pl. Ex. 6) (identifying LCF as plaintiff's place of employment). For the bulk of her tenure there—13 years—plaintiff worked for LCF's transportation team. Doc. 34 at 2 (Pretrial Order ¶ 2.a.i.); Doc. 35-17 at 3 (Pearson Dep. 7:8–9).

Corrections Supervisor I (CSI) Bruce Hollister was plaintiff's direct supervisor during the period relevant to this lawsuit. Doc. 35-19 at 8 (Norton Dep. 33:1–4); Doc. 35-20 at 2 (Skidmore Dep. 21:10–15). Captain Arthur Perez, a shift captain at LCF, was CSI Hollister's direct supervisor. Doc. 35-19 at 8 (Norton Dep. 33:1–5). And Pearson answered directly to Captain Perez when she was not on transportation trips. Doc. 35-20 at 2 (Skidmore Dep. 21:10–15).

### August 2021 Incident

On August 16, 2021, plaintiff was on duty, working a shift on the transportation team. Doc. 34 at 2 (Pretrial Order ¶ 2.a.i.); Doc. 35-5 at 1 (Def. Ex. 4). And plaintiff didn't have any transportation trips to make. Doc. 35-5 at 1 (Def. Ex. 4); Doc. 35-17 at 14 (Pearson Dep. 66:10–12). During this shift, plaintiff entered her car, drove out of the parking lot, and exited the secure perimeter of LCF. Doc. 34 at 2 (Pretrial Order ¶ 2.a.ii.); Doc. 35-5 at 1 (Def. Ex. 4). Plaintiff didn't inform Captain Perez—the captain on duty—that she was leaving the secure perimeter. Doc. 34 at 2 (Pretrial Order ¶ 2.a.iii.); Doc. 35-17 at 15 (Pearson Dep. 67:6–8); Doc. 35-26 at 1 (Perez Aff. ¶ 1). While plaintiff was outside the secure perimeter of LCF, Captain Perez

attempted to locate her, calling her via radio.  Doc. 35-5 at 1 (Def. Ex. 4); Doc. 35-6 at 1 (Def. Ex. 5).  Captain Perez initially heard no response from plaintiff.  Doc. 35-5 at 1 (Def. Ex. 4); Doc. 35-6 at 1 (Def. Ex. 5).  Eventually, Captain Perez heard plaintiff respond.  Doc. 35-9 at 1 (Def. Ex. 8).  She explained that she was retrieving tampons.  *Id.*

Nine days later—on August 25—defendant issued plaintiff a letter of reprimand.  Doc. 34 at 2 (Pretrial Order ¶ 2.a.iv.); Doc. 35-5 (Def. Ex. 4).  The letter suggested that plaintiff had violated internal policies that prohibited abandoning an assigned post and behaving disrespectfully.  Doc. 35-5 at 1–2 (Def. Ex. 4).  But the letter didn't affect plaintiff's pay.  Doc. 35-17 at 22 (Pearson Dep. 95:8–13).  And plaintiff never alleged that defendant reprimanded her because of her gender.  *Id.*; *see also* Doc. 35-19 at 16 (Norton Dep. 76:8–12)*.*  Indeed, plaintiff's gender "was not a factor when issuing the August 2021 letter of reprimand[.]"  Doc. 35-25 at 1 (Skidmore Aff. ¶ 4).  Nor did plaintiff file any grievance against Captain Perez for the August 16 incident.  Doc. 35-17 at 11, 28 (Pearson Dep. 54:16–18, 128:8–12).

In December 2021, plaintiff sent an email asserting that she "officially resigned from transportation[.]"  Doc. 35-14 at 2 (Def. Ex. 13).  That email—which never referenced gender or sex—refers to "flamboyant favoritism" in the transportation team.  *Id.* at 1 (Def. Ex. 13).[1]

### *February 2022 Unauthorized Absence Threat*

On February 23, 2022, plaintiff again left the secure perimeter of LCF while on duty. Doc. 34 at 2 (Pretrial Order ¶ 2.a.v.).  She did so to meet with Human Resources Manager Kalan Norton to file a grievance about the August 2021 incident and letter of reprimand.  *See* Doc. 34 at 2 (Pretrial Order ¶ 2.a.vii.); Doc. 35-17 at 27–28 (Pearson Dep. 127:23–128:8).  But plaintiff

---

[1]    It isn't clear what happened after plaintiff submitted this resignation email.  Neither party discusses its aftermath.  *See generally* Doc. 35; Doc. 36.  But it appears that plaintiff stayed on with the transportation team until she submitted a transfer form in March 2022.  *See* Doc. 36-4 at 1 (Pl. Ex. 3).

left the premises without informing Captain Perez, who was the shift captain on duty. Doc. 34 at

2 (Pretrial Order ¶ 2.a.vi.); Doc. 35-18 at 8 (Perez Dep. 46:15–23); Doc. 35-17 at 31 (Pearson

Dep. 131:20–23). So Captain Perez neither knew *that* plaintiff had left nor *why* she had left.

Doc. 35-26 at 1 (Perez Aff. ¶ 2). But plaintiff had informed her immediate supervisor, CSI

Hollister, that she was going to visit human resources to discuss a grievance against Captain

Perez. Doc. 36-2 at 1 (Pearson Aff. ¶ 3). Captain Perez then called Mr. Norton's office and

located plaintiff. Doc. 35-18 at 6 (Perez Dep. 42:20–21); Doc. 35-19 at 3 (Norton Dep. 25:1–

12). Captain Perez told Mr. Norton to inform plaintiff that she could receive an "unauthorized

absence" until she returned because she left without securing his permission. Doc. 35-18 at 6, 8

(Perez Dep. 42:17–25, 46:15–23). In reality, Captain Perez didn't have authority to assign

plaintiff an "unauthorized absence," so his threat was an empty one. Doc. 35-19 at 8–9 (Norton

Dep. 33:16–34:6).

    After Captain Perez's call to Mr. Norton, plaintiff remained in Mr. Norton's office for 10

to 15 more minutes. Doc. 35-17 at 31 (Pearson Dep. 131:2–15).[2] Defendant neither assigned

plaintiff an "unauthorized absence" nor disciplined her in any fashion for these events on

February 23. Doc. 34 at 2 (Pretrial Order ¶ 2.a.ix.).

---

[2]     Defendant's Statement of Facts asserts that "Pearson remained in the HR office for another twenty to thirty minutes before returning to her post." Doc. 35 at 8 (DSOF ¶ 51). Plaintiff doesn't controvert this fact. Doc. 36 at 2 (identifying ¶ 51 of defendant's Statement of Facts as uncontroverted). But the only evidence in the record that defendant cites—plaintiff's deposition—doesn't support this contention. So, the court doesn't take it as true. *See GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200 (10th Cir. 2022) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings." (quotation cleaned up)). Instead, plaintiff's deposition establishes that she stayed for 10 to 15 minutes after the phone call. Doc. 35-17 at 31 (Pearson Dep. 131:2–15).

### *Harassment Email and Investigation*

After returning from Mr. Norton's office, plaintiff sent an email containing the subject line "Captain Perez harassment" to Deputy Secretary of Corrections Joel Hrabe, Acting Warden James Skidmore, CSI Hollister, Mr. Norton, president of the Kansas Organization of State Employees bargaining unit Sarah LaFrentz, and Captain Perez. *Id.* (Pretrial Order ¶ 2.a.viii.); Doc. 35-17 at 26–27 (Pearson Dep. 126:6–127:11); Doc. 35-10 at 1 (Def. Ex. 9).[3]  The email traces plaintiff's version of the events of February 23.  Doc. 35-10 at 1 (Def. Ex. 9)*.*  It then contains the following passage:

> Captain Perez, you need to STOP!
> You need to LEAVE ME ALONE!
> You are NOT my immediate supervisor!!
> You DO NOT OWN me, as you like to believe!
>
> This is not the first time in which I have had to deal with Captain Perez and his obsession in making it a point to harass me.  That was the reason I was in HR.  He has an entire shift to worry about and he makes it a point to target me and now threaten me with my pay.

*Id.*  After receiving this email, Acting Warden Skidmore requested a statement from CSI Hollister and also asked Major Dan East to get a statement from Captain Perez.  Doc. 35-20 at 3 (Skidmore Dep. 23:17–24).  Acting Warden Skidmore then discussed plaintiff's email with Deputy Secretary Hrabe.  Doc. 35-21 at 2 (Hrabe Dep. 11:15–25).  He also consulted with human resources.  Doc. 35-20 at 5 (Skidmore Dep. 27:16–24).  Captain Perez gave a statement of his version of events to Acting Warden Skidmore.  Doc. 35-7 (Def. Ex. 6).

---

[3]     Plaintiff's email lists Sarah Kose Kise as a recipient.  Doc. 35-10 at 1 (Def. Ex. 9).  That individual now goes by the name Sarah LaFrentz.  Doc. 35-17 at 27 (Pearson Dep. 127:5–7).

Defendant's statement of facts also lists Major Dan East as a recipient of plaintiff's email.  Doc. 35 at 8 (DSOF ¶ 54).  No evidence in the record supports that assertion.  Major East isn't included in the list of recipients on plaintiff's email.  Doc. 35-10 at 1 (Def. Ex. 9).  *See GeoMetWatch Corp.*, 38 F.4th at 1200 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings." (quotation cleaned up)).

Mr. Norton—the human resources manager—thought that Deputy Secretary Hrabe would handle plaintiff's complaint, though he never confirmed that belief. Doc. 35-19 at 3–4 (Norton Dep. 25:19–26:12). And so, Mr. Norton never followed up on plaintiff's email grievance, either because of other obligations or failure to follow through. *Id.* at 14 (Norton Dep. 67:1–11). Deputy Secretary Hrabe didn't know how the investigation into plaintiff's complaint concluded, either. Doc. 35-21 at 6 (Hrabe Dep. 24:12–22). Defendant never sought a further statement from plaintiff on the matter. Doc. 35-20 at 5 (Skidmore Dep. 27:11–15); Doc. 36-11 at 5 (Hrabe Dep. 21:14–18). Plaintiff believed that her email would initiate an investigation and response, but—as far as she knew—it didn't. Doc. 36-10 at 13–14 (Pearson Dep. 165:15–166:11).

Later, another member of the transportation team—Ali Shawki, a man—also complained about Captain Perez's management. Doc. 35-13 at 1–2 (Def. Ex. 12); Doc. 35-19 at 15 (Norton Dep. 73:4–5). Mr. Norton testified that "it's not terribly uncommon for people to dislike" Captain Perez's management style. Doc. 35-19 at 6 (Norton Dep. 31:22–24).

### *March 2022 – Removal from Compound*

On March 15, 2022, plaintiff didn't have any trips to run for the transportation team. Doc. 34 at 2 (Pretrial Order ¶ 2.a.x.). Captain Perez called CSI Hollister to find out why plaintiff was on the compound without checking in at the captain's office. Doc. 35-12 at 3 (Def. Ex. 11). And Captain Perez then told CSI Hollister, if plaintiff didn't have a reason to be at the compound, CSI Hollister should keep her off the compound. *Id.* CSI Hollister told plaintiff that Captain Perez didn't want her on the compound. Doc. 35-17 at 39 (Pearson Dep. 140:10–11); Doc. 35-11 at 1 (Def. Ex. 10). Plaintiff understood this communication as Captain Perez indefinitely removing her from the compound. Doc. 35-17 at 38, 39 (Pearson Dep. 139:6–22, 140:3–13). No other employee of LCF or of defendant confirmed to plaintiff that she couldn't

come to the compound.  *Id.* (Pearson Dep. 139:17–20; 140:16–21).  CSI Hollister didn't specify any duration.  *Id.* at 39 (Pearson Dep. 140:8–15).

During the time when plaintiff thought defendant had banned her from the compound, she felt humiliated and used eight hours of vacation time when she had nothing to do.  Doc. 36-10 at 12 (Pearson Dep. 147:15–22).  Plaintiff still swiped into the compound twice the next day, however.  Doc. 35-16 at 1 (Def. Ex. 15).  And during the two-week period following March 15, plaintiff drove many trips for the transportation team.  Doc. 35-17 at 40 (Pearson Dep. 141:14–18).

### *March 2022 Grievance*

Later in the day on March 15, plaintiff spoke with Marcelle Chmidling, who worked in defendant's EEO Office, about the events that had transpired.  Doc. 36-10 at 11 (Pearson Dep. 146:8–20).  Ms. Chmidling advised plaintiff to file a grievance with human resources.  *Id.* Plaintiff then filed a grievance with human resources stating that Captain Perez had removed her from the compound.  Doc. 34 at 2 (Pretrial Order ¶ 2.a.xi.); Doc. 35-23 at 1–2 (Def. Ex. 22).  That grievance summarized plaintiff's version of events.  Doc. 35-23 at 1–2 (Def. Ex. 22).  It asserts, in pertinent part:

> I was on the compound, when my supervisor CSI Hollister called me by radio to phone him.  He then informed me that I was not allowed to be on the compound around Perez and to come back to the office.  When I got to the office he told me Perez called him asking why I was on the compound, Perez was told by CSI Hollister that I was open and sent to the compound like we are suppose to be. Perez then told him he didn't want me on the compound and to find something for me to do.

*Id.* at 1 (Def. Ex. 22).  Her grievance asks Captain Perez to "[q]uit harassing me."  *Id.*  The grievance goes on to complain that Captain Perez treated a male employee differently than plaintiff:

Alli has the bus today, but he was on the compound this morning too, He also wrote a grievance on Perez for the same things I did.  Was he also told not to be on the compound?  He passed the captain[']s office just like I did.

*Id.*

HR Manager Mr. Norton investigated plaintiff's grievance and sought statements from CSI Hollister and Captain Perez.  Doc. 35-19 at 10, 11 (Norton Dep. 35:4–5, 39:2–11).  CSI Hollister and Captain Perez each gave statements outlining their version of events.  Doc. 35-11 at 1 (Def. Ex. 10); Doc. 35-12 at 3 (Def. Ex. 11).  Defendant took no further action on plaintiff's grievance.  Doc. 35-19 at 12 (Norton Dep. 41:16–22).  Defendant never told plaintiff about the this investigation's outcome.  *Id.* at 13 (Norton Dep. 43:1–5).

At some point in this saga—the record isn't clear whether this happened in the same conversation on March 15 or during an earlier or later conversation—plaintiff complained to Ms. Chmidling that Captain Perez had discriminated against her because of her sex.  Doc. 36-10 at 14 (Pearson Dep. 166:12–20).  But Ms. Chmidling attested that plaintiff "has not filed any formal complaints of discrimination or harassment" with her during Ms. Chmidling's tenure of employment with defendant.  Doc. 36-6 at 1 (Chmidling Decl.).

### *Transfer*

After these events, in March 2022, plaintiff reluctantly requested that defendant transfer her away from the transportation team to avoid Captain Perez.  Doc. 36-10 at 16 (Pearson Dep. 205:9–14); Doc. 36-4 at 1 (Pl. Ex. 3); Doc. 36-2 at 2 (Pearson Aff. ¶ 5).  Defendant's failure to respond adequately to plaintiff's grievances also motivated her to transfer positions.  Doc. 35-17 at 44 (Pearson Dep. 154:13–20).  In April 2022, plaintiff transferred posts.  Doc. 36-3 at 1 (Pl. Ex. 2).

Before transferring posts, plaintiff enjoyed a flexible work schedule that didn't require her to work on weekends or holidays.  Doc. 36-2 at 2 (Pearson Aff. ¶ 6).  After transferring posts,

plaintiff no longer enjoyed this flexible schedule and had to work on some holidays and weekends. *Id.* That change negatively affected plaintiff and made it more difficult for her to care for her youngest child. *Id.* (Pearson Aff. ¶ 7).

## II.        Summary Judgment Standard

Summary judgment is appropriate where the moving party demonstrates there is "no genuine dispute" about "any material fact" and that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To carry this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)). Even if the non-moving party fails to respond adequately, "the district court may not grant the motion without first examining the moving party's submission to determine if it has met its initial burden of demonstrating that no material

issues of fact remain for trial and the moving party is entitled to judgment as a matter of law."
*Reed v. Bennett*, 312 F.3d 1190, 1194–95 (10th Cir. 2002).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its
pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those
dispositive matters for which it carries the burden of proof.'"  *Kannady*, 590 F.3d at 1169
(quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*,
477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  The specific "facts must be identified
by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."
*Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Adler*, 144
F.3d at 671).  Affidavits and testimony "must be based upon personal knowledge and set forth
facts that would be admissible in evidence; conclusory and self-serving affidavits are not
sufficient."  *Tucker v. Faith Bible Chapel Int'l*, 36 F.4th 1021, 1030–31 (10th Cir. 2022)
(quotation cleaned up).

Finally, since 1986, federal courts haven't viewed summary judgment as a "disfavored
procedural shortcut."  *Celotex*, 477 U.S. at 327.  Instead, it represents an important procedure
"designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Id.*
(quoting Fed. R. Civ. P. 1).

## III.    Administrative Exhaustion

Before reaching the merits of plaintiff's claim, the court addresses administrative
exhaustion.  In a one-line argument, defendant asserts that plaintiff's Title VII discrimination
claim fails because plaintiff didn't exhaust administrative remedies.  Doc. 39 at 9.  The court
won't evaluate defendant's argument for two reasons.  *First*, defendant raised this argument for
the first time in its Reply.  Our Circuit refuses to "consider arguments made for the first time" in
a reply brief and "deem[s] those arguments waived."  *United States v. Leffler*, 942 F.3d 1192,

1197 (10th Cir. 2019). District courts in our Circuit routinely follow suit. *Bordertown, LLC v. AmGUARD Ins. Co.*, No. 22-cv-01683-REB-GPG, 2022 WL 17538186, at *2 (D. Colo. Oct. 5, 2022) (collecting cases). *Second*, the five words defendants devote to this argument are far too perfunctory for the court to consider in any substantive fashion. *E.g.*, *United States v. Moya*, 5 F.4th 1168, 1192 (10th Cir. 2021) (explaining that litigants waive arguments "when they are inadequately presented" (quotation cleaned up)); *Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("This briefing-waiver rule applies equally to arguments that are . . . presented only in a perfunctory manner." (quotation cleaned up)). Still, the court would need to evaluate this administrative exhaustion argument if it were jurisdictional.

Fortunately, for plaintiff, it's not. Our Circuit, in *Lincoln v. BNSF Railway*, overruled existing precedent and held that an employee's failure to exhaust administrative remedies through the EEOC "merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." 900 F.3d 1166, 1185 (10th Cir. 2018). Ordinarily, the "distinction between a jurisdictional requirement and an affirmative defense is immaterial." *Smith v. Cheyenne Ret. Invs. L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018). But, because exhaustion isn't jurisdictional, a court needn't consider it if it isn't before the court properly. *Id.* (citing *McQueen ex rel. McQueen v. Colo. Springs Sch. Dist. No. 11*, 488 F.3d 868, 873 (10th Cir. 2007)). And here, defendant hasn't properly presented any substantive reason that plaintiff has failed to exhaust. So the court doesn't consider that issue. Now, to the merits.

## IV.        Title VII and the *McDonnell Douglas* Burden-Shifting Framework

"Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Khalik*

*v. United Air Lines*, 671 F. 3d 1188, 1192 (10th Cir. 2012) (quoting 42 U.S.C. § 2000e-2(a)(1)).

Also, "Title VII's anti-retaliation provision (the opposition clause) bars an employer from

discriminating against an individual who has 'opposed any practice made an unlawful

employment practice' by the statute." *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir.

2021) (quoting 42 U.S.C. § 2000e-3(a)).

A Title VII plaintiff may use direct evidence or indirect evidence, or both, to support her

claims. *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). Plaintiff here concedes that she

presents only indirect evidence of discrimination. Doc. 36 at 12. At the summary judgment

stage, the court analyzes indirectly supported claims under the burden-shifting framework of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Khalik*, 671 F.3d at 1192. Under

*McDonnell Douglas*, a plaintiff, *first*, must establish a prima facie case. *Bekkem*, 915 F.3d at

1267. The "burden on the employee to establish a prima facie case is light[.]" *Guy v.*

*McDonough*, No. 20-6158, 2021 WL 3854764, at *2 (10th Cir. Aug. 30, 2021). *Second*, if

plaintiff satisfies the obligations for a prima facie case, then the burden shifts to defendant, who

must produce "'a legitimate nondiscriminatory reason for its employment decision.'" *Bekkem*,

915 F.3d at 1267 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). As with

the employee's burden at the first step, the employer's burden at this second stage is

"exceedingly light." *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007) (internal

quotation marks omitted). *Last*, the burden shifts back to the plaintiff, who must "show that

there is a genuine dispute of material fact as to whether the employer's proffered reason for the

challenged action is pretextual—*i.e.*, unworthy of belief." *Bekkem*, 915 F.3d at 1267 (quotation

cleaned up). This framework applies both to plaintiff's Title VII discrimination claim and Title

VII retaliation claim. *See Khalik*, 671 F.3d at 1192.

The court, next, applies this framework to plaintiff's claims, starting with *McDonnell Douglas*'s first prong:  the prima facie case.  The court evaluates plaintiff's prima facie case separately for her discrimination claims and then for her retaliation claims, below.

## V.        Title VII Discrimination (Count I)

The court grants summary judgment against plaintiff's Title VII discrimination claim. Plaintiff's claim can't even clear the prima facie runway.

For a Title VII discrimination claim, "a prima facie case requires evidence that:  '(1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination.'"  *Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1215 (10th Cir. 2022) (quoting *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).  Again, the plaintiff's "burden at the prima facie stage 'is not onerous.'"  *Id.* (quoting *Orr v. City of Albuquerque*, 417 F.3d 1144, 1152 (10th Cir. 2005)).  All the same, it's a burden that plaintiff here can't shoulder. The parties agree that plaintiff belongs to a protected class.  She thus satisfies the first element of a prima facie case.  Doc. 35 at 16.  But plaintiff's case crumbles at the second and third elements. The court starts with the second element:  adverse employment action.

### A.        Adverse Employment Action

Courts define the term adverse employment action "liberally," meaning that these actions "are not simply limited to monetary losses in the form of wages or benefits."  *Braxton v. Nortek Air Sols., LLC*, 769 F. App'x 600, 604 (10th Cir. 2019) (internal quotation marks and citation omitted).  "A strong indicator that a challenged employment action is adverse 'is that the action causes harm to future employment prospects.'"  *Id.* at 605 (quoting *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004)).  And, to qualify as adverse, an employment action generally must include "a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant

change in benefits." *Ford*, 45 F.4th at 1222 (internal quotation marks and citation omitted).

    To be certain, the Supreme Court's recent decision in *Muldrow v. City of St. Louis*, may

require extraction of "significant" and "significantly" from *Ford*'s definition of adverse.[4] 601

U.S. 346, 355 (2024) ("To demand 'significance' is to add words—and significant words, as it

were—to the statute Congress enacted. It is to impose a new requirement on a Title VII

claimant, so that the law as applied demands something more of her than the law as written.")

Nonetheless, *Muldrow* still requires "some 'disadvantageous' change in an employment term or

condition" or "some harm respecting an identifiable term or condition of employment." *Id.* at

354–55 (quotation cleaned up). And so—even without importing the significance requirement

into the definition of adverse—"a mere inconvenience or an alteration of job responsibilities

does not qualify." *Ford*, 45 F.4th at 1222 (quotation cleaned up). That is, "[n]ot everything that

---

[4]    *Muldrow* specifically considered a Title VII challenge to a job transfer. 601 U.S. at 350. The Tenth Circuit hasn't addressed the breadth of *Muldrow*'s reach. But some Circuits have acknowledged that *Muldrow* may affect the adverse employment action analysis more generally, that is, beyond the job transfer context. *See, e.g.*, *Blick v. Ann Arbor Pub. Sch. Dist.*, 105 F.4th 868, 885 (6th Cir. 2024) (acknowledging *Muldrow* may call the Sixth Circuit's precedent "into doubt" but saving "*Muldrow*'s effect on our caselaw for another day"). And our court has applied *Muldrow* more broadly, consulting its lenient standard when analyzing an adverse employment action not in the job transfer context. *See Harris v. U.S. Dep't of Veterans Affs., Sec'y of*, No. 22-CV-02489-HLT, 2024 WL 3010879, at *10 (D. Kan. June 14, 2024) ("No reasonable jury could conclude that the alleged multiple investigations were an adverse employment action, even under the more lenient standard of *Muldrow*."). This Order doesn't require the court to decide *Muldrow*'s scope, however.

    Instead, the court accounts for a broad application that would alter the adverse standard as applied to this case. After all, plaintiff here brings her discrimination claims under the same statutory provision at issue in *Muldrow*, 42 U.S.C. § 2000e-2(a)(1). And *Muldrow* largely rests on a textual reading of that very provision, making application to this case conceivable. *See Smith v. McDonough*, No. CV 20-1321 KK/JFR, 2024 WL 2804428, at *8–10 (D.N.M. May 31, 2024) (completing a sua sponte review of a previous Order's ruling on disparate treatment claims not involving a job transfer to account for *Muldrow*'s new standard). And so, the court will not apply the potentially offending "significant" from *Ford*'s adverse standard. Thus—even if courts apply to all § 2000e-2(a)(1) employment discrimination cases *Muldrow*'s denouncement of importing "significant," "serious," "substantial, or any similar adjective" into the text of Title VII—it doesn't affect the analysis here.

makes an employee unhappy is an actionable adverse action." *Braxton*, 769 F. App'x at 604 (quotation cleaned up).

Here, no reasonable jury could find that plaintiff sustained an adverse employment action. Plaintiff describes the primary adverse employment action she alleges like this: "the cumulative effect of [defendant's] wanton failure to address her claims of harassment because of her gender compelled her to undertake a self-imposed remedy, her begrudging request to accept another post, to avoid Captain Perez, even to the detriment of losing time with her children." Doc. 36 at 14.[5] In other words, plaintiff alleges that defendant effectively compelled her to request a transfer, which adversely affected the terms and conditions of her employment.

To be sure, if plaintiff could prove that defendant had forced her to transfer positions, that well might qualify under *Muldrow* as an adverse employment action. That's so because plaintiff's new position has less flexible hours and requires her to work on some weekends and holidays. *See Muldrow*, 601 U.S. at 354–55 ("To make out a Title VII discrimination claim, a transferee must show some harm respecting an identifiable term or condition of employment."). But, as the court explains, plaintiff here can't shoulder that burden. Even viewing the facts in the light most favorable to plaintiff, no reasonable jury could find or infer that defendant compelled plaintiff to transfer jobs.[6]

---

[5]    Plaintiff's brief could suggest that defendant's failure to investigate adequately her February 2022 grievance adversely affected the terms and conditions of her employment. Doc. 36 at 16. The court—out of an abundance of caution—addresses that argument, below. *See* n.8.

[6]    Defendant—in a one sentence argument in its Reply—contends that plaintiff's constructive discharge theory is barred because it isn't included in the Pretrial Order. Doc. 39 at 9. While defendant raised this argument for the first time in its Reply brief—an issue which ordinarily precludes the court's review—the court sua sponte may determine whether the Pretrial Order preserves a theory of claim. *See Zenith Petrol. Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) ("[A] district court has authority to sua sponte confine the litigation to the claims and issues identified in the pretrial order."). Here, the court is satisfied that the Pretrial Order properly preserves plaintiff's theory of constructive involuntary transfer. Plaintiff's factual contentions in the Pretrial Order mention plaintiff reluctantly transferring positions and sustaining an adverse change in work schedule as a result. Doc. 34 at 5

As an initial matter, our Circuit—so far as the court's research revealed—never has recognized an adverse employment action on a constructive involuntary transfer theory. But our Circuit has recognized claims based on constructive discharge, which "'occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign.'" *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1318 (10th Cir. 2017) (quoting *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1269 (10th Cir. 2015)). And courts outside our Circuit have recognized claims applying this theory to voluntary transfers—much as plaintiff tries to do here. *E.g.*, *United States v. N.Y.C. Dep't of Educ.*, No. 16-CIV-4291-(LAK)(JCF), 2017 WL 435940, at *8 (S.D.N.Y. Jan. 31, 2017) ("Just as a voluntary resignation becomes actionable as a constructive discharge when an employer creates working conditions so intolerable that a reasonable person would feel compelled to resign, a voluntary transfer to a materially inferior position becomes actionable as a constructive involuntary transfer."); *Brown v. Mayorkas*, No. CV 20-3107 (TJK), 2023 WL 3303862, at *7 (D.D.C. May 8, 2023) ("A plaintiff might theoretically apply the constructive-discharge doctrine to a transfer by alleging a 'constructive involuntary transfer.'"). So the court assumes—without deciding—that our Circuit would recognize an adverse employment action based on constructive involuntary transfer, when a plaintiff satisfies the same criteria that our Circuit requires for a constructive discharge claim.

Even assuming the Tenth Circuit would accept constructive involuntary transfer as an adverse employment action, however, plaintiff can't satisfy the requisite criteria. Before explaining this conclusion, the court explains the governing standard for a constructive discharge

---

(Pretrial Order ¶ 3.a.). Because the court "liberally construe[s]" the Pretrial Order "to cover any of the legal or factual theories that might be embraced" by it, *Zenith Petrol.*, 656 F. App'x at 887, the court is satisfied that the Pretrial Order properly preserved plaintiff's constructive involuntary transfer theory.

allegation.  Then, the court applies this standard to plaintiff's constructive involuntary transfer theory.

Our Circuit has explained that the "plaintiff's burden in establishing constructive discharge is substantial." *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008); *see also Steele v. City of Topeka*, 189 F. Supp. 3d 1152, 1160 (D. Kan. 2016) ("Constructive discharge is not proven easily.").  "To establish constructive discharge, a plaintiff must show that she had no other choice but to quit." *Hiatt*, 858 F.3d at 1318 (internal quotation marks and citation omitted).  The plaintiff's "'subjective views of the situation are irrelevant,' and she must instead show 'the conditions of employment were objectively intolerable.'" *Id.* (quotation cleaned up) (quoting *Bennett*, 792 F.3d at 1269); *Brown v. Austin*, 13 F.4th 1079, 1093 (10th Cir. 2021) ("Although [plaintiff] may have found conditions extremely difficult, his subjective experience does not establish that objectively the Agency's actions left him no choice but to resign." (quotation cleaned up)).  Working conditions that are "merely 'difficult or unpleasant'" won't satisfy this standard.  *Steele*, 189 F. Supp. 3d at 1152 (quoting *Potts v. Davis County*, 551 F.3d 1188, 1194 (10th Cir. 2009)).  For example, in *Sampson v. Kane Is Able, Inc.*, plaintiff's employer suspended plaintiff without pay, removed his supervisory responsibilities, and reduced his pay by one dollar per hour.  812 F. App'x 746, 750 (10th Cir. 2020).  Still, our Circuit concluded that no reasonable jury could find those consequences "objectively intolerable[.]" *Id.* (quotation cleaned up).  To prevail on a constructive discharge theory, a plaintiff must prove that she "had '*no other choice* but to quit.'" *Potts*, 551 F.3d at 1194 (emphasis in original) (quoting *Yearous v. Niobara Cnty. Memorial Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)).

Plaintiff argues that four events "compelled her to undertake a self-imposed remedy, her begrudging request to accept another post[.]"  Doc. 36 at 14.  These four events include

defendant: (1) issuing a letter of reprimand to plaintiff; (2) threatening plaintiff with an "unauthorized absence" when she filed a grievance; (3) failing to investigate plaintiff's claims of harassment; and (4) ordering plaintiff off the compound. *Id.* at 14–16. Taken individually or collectively, a reasonable jury couldn't conclude that these events rendered plaintiff's employment "objectively intolerable." *Hiatt*, 858 F.3d at 1318. The court addresses all four events in turn, explaining why—under our Circuit's binding precedents—a reasonable jury couldn't conclude these events rendered plaintiff's employment objectively intolerable.[7]

### 1. August 2021 Incident and Write-Up

Plaintiff first invokes the August 2021 incident and the ensuing letter of reprimand. Recall that defendant issued plaintiff a letter of reprimand after plaintiff left the premises without her supervisor's permission. Doc. 35-5 at 1–2. A reasonable jury couldn't find that this letter of reprimand amounts to an objectively intolerable employment situation.

Defendant's letter of reprimand doesn't raise a triable issue of objectively intolerable employment. The letter didn't affect the terms and conditions of plaintiff's employment, a point which plaintiff expressly concedes. Doc. 36 at 15; Doc. 35-17 at 22 (Pearson Dep. 95:8–13). Instead, the letter reminded plaintiff of her duty to obey defendant's internal policies. *See* Doc.

---

[7]    Other than possibly defendant's failure to investigate plaintiff's February 2022 grievance adequately, plaintiff never argues that these events—by themselves—are adverse employment actions. *See* Doc. 36 at 13–18. Instead, plaintiff's only argument that she suffered an adverse employment action is that she "suffered an adverse employment action when she begrudgingly decided to change posts from Transport to Security Patrol." *Id.* at 13. So, the court doesn't consider whether any of the events plaintiff cites—independently— could support an adverse employment action. The court's role is to "address the limited argument [plaintiff] actually advanced—but no more." *Chieftain Royalty Co. v. SM Energy Co.*, 100 F.4th 1147, 1159 n.17 (10th Cir. 2024).

In any event, even if plaintiff had argued that these individual events constituted adverse employment actions, the court still would grant summary judgment against plaintiff's Title VII discrimination claim because plaintiff hasn't adduced evidence that these events "took place under circumstances giving rise to an inference of discrimination." *Ford*, 45 F.4th at 1215 (quotation cleaned up); *see below* § V.B.

35-5 at 1–2 (Def. Ex. 4).  While plaintiff may have found that letter unpleasant, the "law expects employees to tolerate merely 'difficult or unpleasant' working conditions[.]"  *Steele*, 189 F. Supp. 3d at 1161 (quoting *Potts*, 551 F.3d at 1194).  No jury reasonably could find that reminding an employee of workplace guidelines renders working conditions objectively intolerable.  Plaintiff cites no authority—nor could the court find any—to support such a position.  What's more, the uncontroverted summary judgment facts reveal that plaintiff's sex didn't motivate the letter of reprimand.  Doc. 35-25 at 1 (Skidmore Aff. ¶ 4) ("Pearson's gender was not a factor when issuing the August 2021 letter of reprimand against Peraon.").  Without any discriminatory motive, the letter of reprimand can't support plaintiff's constructive involuntary transfer argument.  *See Rivero v. Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 761 (10th Cir. 2020) (explaining that constructive discharge requires that "'plaintiff *was discriminated against* by his employer to the point where a reasonable person in his position would have felt compelled to resign'" (emphasis added) (quotation cleaned up) (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016))).

So, the August 2021 incident and defendant's letter of reprimand can't support plaintiff's constructive involuntary transfer theory.  Up next:  the unauthorized absence threat.

### 2.  Unauthorized Absence Threat

Like the August 2021 situation, defendant's threat of charging plaintiff with an unauthorized absence doesn't raise a triable issue of constructive involuntary transfer.  Plaintiff advances no argument and cites no authority to suggest an informal and unrealized threat of discipline makes employment objectively intolerable.  Doc. 36 at 15–16.  Plaintiff explains that an unauthorized absence would result in a loss of pay, but she concedes that defendant didn't mark her absent and didn't dock her paycheck.  *Id.* at 15.  That concession ends the debate about plaintiff's conclusory, *ipse dixit* argument.  A mere threat of an unauthorized absence adds

nothing to plaintiff's constructive involuntary transfer allegations.  Plaintiff hasn't explained

plausibly why this threat "left [her] no choice but to resign." *Brown*, 13 F.4th at 1093 (quotation

cleaned up).  No reasonable jury could conclude that the mere threat of disciplinary action makes

a job objectively intolerable.  So, the unauthorized absence threat can't support a theory of

constructive involuntary transfer.  Now, the court considers defendant's failure to investigate

plaintiff's complaints.

### 3.   Failure to Investigate

Next, plaintiff advances another argument in drive-by fashion.  She asserts that

defendant's failure to investigate the complaint she emailed after the February 2022 event

contributed to her constructive involuntary transfer.  *See* Doc. 36 at 16.[8]

---

[8]       The court already explained that plaintiff has explained only constructive involuntary transfer as
an adverse employment action.  Out of an abundance of caution, the court briefly explains why no
reasonable jury could find a failure to investigate an independent adverse employment action.

Neither our Circuit nor our court have addressed expressly whether an employer's failure to
investigate is an adverse employment action for a Title VII discrimination claim.  But the weight of
authority from outside our Circuit holds that an employer's failure to investigate is not an adverse
employment action.  *E.g.*, *Hare v. Potter*, 220 F. App'x 120, 134 (3d Cir. 2007) (affirming summary
judgment against gender discrimination claim and rejecting argument that failure to investigate
harassment claim is adverse employment action); *El v. Sam's East, Inc.*, No. 23-cv-831-VMC-CMS, 2024
WL 4217537, at *3 (N.D. Ga. Apr. 23, 2024) ("Standing alone, a deficient response from HR in response
to a complaint (or a deficient investigation) will not qualify as an adverse employment action." (citation
omitted)); *Robinson v. Renown Reg'l Med. Ctr.*, No. 16-cv-00372-MMD-WGC, 2018 WL 1463382, at *4
(D. Nev. Mar. 23, 2018) (granting summary judgment and concluding that "[i]nvestigating complaints of
alleged harassment and failing to investigate Plaintiff's complaints about other employees are not adverse
employment actions because Plaintiff has not demonstrated that these actions affected his terms and
conditions of employment"); *Medline v. Am. Airlines*, No. 16-5708, 2018 WL 4055307, at *3 (E.D. Pa.
Aug. 27, 2018) (granting summary judgment and holding that where plaintiff alleged failure to investigate
sexual harassment, "such a failure is not an adverse employment action"); *see also Chuang v. Univ. of
Calif. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000) (affirming summary judgment and holding
failure to inform plaintiff about outcome of investigation "did not materially affect the compensation,
terms, conditions, or privileges" of his employment and was therefore not an adverse employment action).
And these courts have reached these conclusions for good reason.  An employer's failure to follow-up on
an employee's complaints doesn't harm "an identifiable term or condition of employment."  *Muldrow*,
601 U.S. at 355.

Also, remember that it's undisputed.  Defendant *did* investigate plaintiff's grievance.  *E.g.*, Doc.
35-20 at 3 (Skidmore Dep. 23:17–24); Doc. 35-21 at 2 (Hrabe Dep. 11:15–25); Doc. 35-7 (Def. Ex. 6).

But defendant's failure to investigate can't contribute to plaintiff's constructive involuntary transfer theory. Plaintiff cites no authority to support her assertion that defendant's failure to investigate her allegations of harassment compelled her to transfer positions. Doc. 36 at 15–16. It's difficult to see how an employer's failure to investigate a complaint—as distinct from the underlying substance of the complaint—could render a job objectively intolerable. And the courts who have addressed this issue agree that an employer's failure to investigate a complaint can't support a constructive discharge (or in this case, constructive involuntary transfer) claim. *See, e.g.*, *O'Dell v. Trans World Ent. Corp.*, 153 F. Supp. 2d 378, 393 (S.D.N.Y. 2001) ("[F]ailing to take a sexual harassment complaint seriously does not constitute a constructive discharge. Courts finding instances of constructive discharge have required more serious conduct[.]"); *Mullins v. Healthcare Saginaw, Inc.*, No. 16-cv-11283, 2017 WL 3034628, at *3 (E.D. Mich. July 18, 2017) (holding that plaintiff's claim that defendant "created a hostile work environment when it failed to investigate her complaints" to plaintiff's satisfaction couldn't support a constructive discharge assertion). So, plaintiff's failure-to-investigate theory falls short. No reasonable jury could find this theory supports a constructive involuntary transfer. That conclusion leaves one final argument: removal from the compound.

### 4. Removal from Compound

Plaintiff next argues that defendant ordered her off the compound and that no one told her she could return. Doc. 36 at 16–17. And so, plaintiff didn't return to the compound for about two weeks. *Id.* at 17. During that time, she "felt humiliated" and used eight hours of vacation

---

Defendant's investigation just didn't measure up to plaintiff's expectations. So as compared to the litany of cases cited above, the case is even stronger here that plaintiff sustained no adverse employment action. At bottom, no matter how poorly defendant investigated plaintiff's email alleging harassment, that investigation didn't affect—let alone *adversely* affect—the terms and conditions of plaintiff's employment. The evidence that plaintiff has adduced about an insufficient investigation doesn't raise a triable issue of an adverse employment action.

time when she had nothing to do. *Id.*; Doc. 36-10 at 12 (Pearson Dep. 147:15–22). No matter how humiliated and unpleasant plaintiff found this situation, a reasonable jury couldn't conclude that plaintiff had no choice but to transfer jobs based on these events.

Recall that the plaintiff's burden for such a claim is "substantial[.]" *Fischer*, 525 F.3d at 980. And our Circuit has concluded that mild blowback of the kind plaintiff alleges doesn't render employment "objectively intolerable." *See, e.g.*, *Hiatt*, 858 F.3d at 1318 (holding that requirement "to work two extra hours per week, turn in timely case notes, and justify non-FMLA sick time . . . do not amount to an objectively intolerable working environment"); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1325–26 (10th Cir. 2004) (finding that employer investigating plaintiff and transferring her to a smaller office that she disliked—when remote work was available—couldn't support constructive transfer).

No matter how unpleasant plaintiff thought this exchange with her employer was, it didn't render plaintiff's employment objectively intolerable. Plaintiff continued working during this time. Doc. 35-17 at 40 (Pearson Dep. 141:14–18) ("[CSI Hollister] put me on a lot of trips so I could get my hours in."). And her work remained largely of the same nature—driving transport. *See id.* What's more, plaintiff swiped into the compound the day after Captain Perez ordered her off, and she never alleges any consequence for so doing. Doc. 35-16 at 1 (Def. Ex. 15). Finally, plaintiff never alleges the two weeks off the compound affected her compensation. Compare those facts to *Sampson*'s facts. In *Sampson*, the employer suspended the plaintiff without pay, stripped his supervisory responsibilities and lead designation, and reduced his pay. 812 F. App'x at 750. And still, our Circuit concluded that no jury could find those conditions "'so objectively intolerable' that he 'had no other choice but to quit.'" *Id.* (quoting *Hiatt*, 858 F.3d at 1318). Given that comparison, a reasonable jury couldn't conclude that plaintiff here has

carried her substantial burden of proving "that she had no other choice but to quit" or transfer.
*Hiatt*, 858 F.3d at 1318 (internal quotation marks and citation omitted).

### 5. Constructive Involuntary Transfer Conclusion

No reasonable factfinder could conclude that any of the events plaintiff alleges—
individually or collectively—rendered plaintiff's employment objectively intolerable. Plaintiff
can't carry the steep burden of proving that she had no choice but to quit—or change—her job.
Even in cases—like *Sampson*—that have involved more severe treatment of employees than
plaintiff alleges here, our Circuit has affirmed summary judgment on constructive discharge
claims. Taken on the whole, no reasonable jury could find that defendant rendered plaintiff's
employment objectively intolerable and that plaintiff had no choice but to transfer jobs.

So, plaintiff has failed to create a triable issue on the adverse employment action element
of her prima facie Title VII discrimination claim, and the court thus grants summary judgment
against this claim. But even if plaintiff carried her burden on this part of her prima facie case,
the court still would grant summary judgment because the circumstances of the any adverse
employment action don't give rise to an inference of discrimination. The court explains, next.

### B.    Inference of Discrimination

Plaintiff likewise has failed to present a triable issue on the final element of a prima facie
discrimination claim: inference of discrimination. For this element, a plaintiff must show that
"'the challenged action took place under circumstances giving rise to an inference of
discrimination.'" *Ford*, 45 F.4th at 1215 (quoting *PVNF*, 487 F.3d at 800). Plaintiffs often
satisfy this burden "by proof that the employer treated similarly situated employees more
favorably[.]" *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005). Nonetheless,
courts shouldn't "mistake[]" proof of a similarly situated employee "as an indispensable element
of the prima facie case." *Id.* Only when a plaintiff uses the similarly situated employee method

to raise an inference of discrimination is a claim properly analyzed only in those terms. *Id.* at 1173–74. A variety of other circumstances can give rise to the inference of a discriminatory motive. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). They include: decisionmakers' actions or remarks that may reflect a discriminatory animus; treating employees outside the protected class preferentially; repeatedly recommending plaintiff for positions unsuitable to her qualifications; or failing to offer plaintiff's name for positions well-suited to her qualifications. *Id.*

Plaintiff can't satisfy this requirement. To begin, plaintiff's argument here is difficult to follow. Doc. 36 at 18–19. Generously interpreting plaintiff's brief, the court identifies two arguments plaintiff advances to raise an inference of discrimination. *First*, plaintiff argues that her email alleging harassment "raised inferences of discrimination[.]" *Id.* at 19.[9] *Second*, plaintiff argues that defendant's failure to investigate her email grievance adequately raises an inference of discrimination. *Id.* at 18–19. The court isn't persuaded that a reasonable jury could infer discrimination from either.

Plaintiff's email fails to raise an inference of discrimination. Plaintiff's email doesn't allege any gender-based discrimination. Doc. 35-10 at 1 (Def. Ex. 9); *see also below* § VI.A. Instead, it alleges that Captain Perez's behavior is "inappropriate, unprofessional," "rude, disrespectful, and" "illegal." *Id.* But none of those descriptors suffice to raise a triable issue supporting an inference of *sex discrimination*, which plaintiff now alleges. *See, e.g.*, *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) ("Title VII does not prohibit all verbal

---

[9]     Plaintiff's suggestion that *her* email "raised inferences of discrimination" misunderstands the relevant inquiry for this prong. Doc. 36 at 19. To raise an inference of discrimination, plaintiff must point to circumstances suggesting that the *decisionmaker* acted in discriminatory fashion. *See Plotke*, 405 F.3d at 1101 (giving examples of ways plaintiffs can satisfy this prong—all of which focus on the decisionmaker's actions). Plaintiff's email—which speaks only to plaintiff's subjective understanding of the situation—doesn't allow a reasonable jury to infer that *defendant* acted with discriminatory animus.

or physical harassment in the workplace; it is directed only at *discrimination* because of sex."
(emphasis in original and quotation cleaned up)); *Raybon v. Ala. Space Sci. Exhibit Comm'n*,
337 F. Supp. 3d 1153, 1170 (N.D. Ala. 2018) ("Unfair treatment of an employee, standing alone,
does not make out a Title VII case[.]" (quotation cleaned up)).

What's more, even if plaintiff's email alleged sex discrimination, "an employee's
subjective belief in a comment's invidious nature also does not support an inference of
discriminatory intent." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1151
(10th Cir. 2008). *See also Henry v. McDonald*, 531 F. Supp. 3d 573, 586 (E.D.N.Y. 2021) ("No
one particular type of proof is required to support an inference of discrimination, but a plaintiff's
mere subjective belief that he was discriminated against will not sustain a claim."). Put simply,
"subjective belief of discrimination is not sufficient to preclude summary judgment." *Aramburu
v. Boeing Co.*, 112 F.3d 1398, 1408 n.7 (10th Cir. 1997). So even if plaintiff's email had alleged
sex discrimination—again, it didn't—it wouldn't allow a reasonable jury to infer discrimination.
That leaves plaintiff's deficient investigation argument.

Plaintiff also argues that defendant's shoddy investigation of plaintiff's complaint raises
an inference of discrimination. Doc. 36 at 18–19. Once more, plaintiff cites zero authority to
support this argument. Remember, defendant sought statements from Captain Perez after
plaintiff's February 2022 email and after plaintiff's March 2022 grievance. Doc. 35-7 (Def. Ex.
6); Doc. 35-12 at 3 (Def. Ex. 11).[10] Without that alleged deficiency, plaintiff's argument rests
solely on defendant's failure to secure an additional statement from her. *See* Doc. 36 at 19. That

---

[10]    Plaintiff asserts that defendant never sought statements from Captain Perez. Doc. 36 at 19. But
evidence in the summary judgment record completely belies plaintiff's conclusory argument. Captain
Perez furnished statements to defendant. Doc. 35-7 (Def. Ex. 6); Doc. 35-12 at 3 (Def. Ex. 11). Plaintiff
adduces no evidence to dispute that Captain Perez furnished statements to defendant, and her conclusory
arguments can't create a triable issue.

bare assertion won't do.  Plaintiff had already submitted her version of events to defendant when she submitted her grievance.  Defendant thus has a logical explanation for why it didn't seek further input from plaintiff:  She already had given defendant her side of the story.  *See* Doc. 39 at 4.  And even if one accepts the premise that defendant should have interviewed plaintiff, plaintiff hasn't adduced any evidence to suggest that defendant's failure to do so raises an inference of discrimination.  *See Shapolia v. Los Alamos Nat'l Lab'y*, 992 F.2d 1033, 1039 (10th Cir. 1993) (concluding that alleged "procedural irregularities" didn't create an inference of discrimination because no evidence suggested "the irregularities were connected to the alleged discrimination").[11]

So, neither of plaintiff's bases for alleging an inference of discrimination can withstand summary judgment.  Neither plaintiff's subjective feelings about the situation nor defendant's failure to execute a perfect investigation of plaintiff's complaint create a triable issue that any discrimination was afoot.[12]

---

[11]    Plaintiff's brief argues that defendant violated one of its internal policies by failing to respond adequately to plaintiff's email grievance.  Doc. 36 at 18.  But the internal procedure plaintiff cites requires a response when employees complain of discrimination.  Doc. 36-5 at 2 (Pl. Ex. 4).  Plaintiff's February 2022 email says nothing of discrimination.  *See below* § VI.A.  The policy plaintiff cites thus adds nothing to her argument.

[12]    In support of pretext, plaintiff argues that defendant allowed similarly situated male employee to stay on the compound when defendant removed plaintiff.  Doc. 36 at 21.  And our Circuit has recognized that pretext evidence may help support a prima facie case "if it indeed gives rise to an inference of actionable discriminatory intent."  *Adamson*, 514 F.3d at 1151.  But plaintiff never made that argument.  So the court needn't assess it.  *See Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (explaining that the court "will not craft a party's arguments" for it).  Regardless, plaintiff didn't preserve this argument in the Pretrial Order.  The Pretrial Order never mentions Mr. Shawki or that defendant purportedly treated plaintiff differently than any other employee on March 15 (or any other date).  *See generally* Doc. 34 (Pretrial Order).  The court thus finds that plaintiff waived any argument about defendant treating her differently than similarly situated employees.  *See Zenith Petrol.*, 656 F. App'x at 887 ("'Claims, issues, defenses, or theories of damages not included in the pretrial order are waived.'" (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

### C.    Discrimination Conclusion

Plaintiff can't state a prima facie Title VII discrimination claim.  A reasonable jury couldn't infer that she suffered an adverse employment action.  And even if it could, the circumstances of that adverse employment action don't give rise to an inference of discrimination.  No reasonable factfinder could conclude otherwise.  Because plaintiff can't state a prima facie case, the court needn't advance in the *McDonnell Douglas* framework and analyze pretext.  *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 n.12 (10th Cir. 2008) ("[I]f an employee fails to present even the limited quantum of evidence necessary to raise a prima facie inference that his or her protected activity led to an adverse employment action, it can become pointless to go through the motions of the remainder of the *McDonnell Douglas* framework to determine that unlawful retaliation was not at play.").  Defendant is entitled to summary judgment on plaintiff's Title VII discrimination claim.

Plaintiff doesn't fare any better on her Title VII retaliation claim, as the court explains, next.

### VI.    Title VII Retaliation (Count II)

To make out a prima facie case for a Title VII retaliation claim, plaintiff "must show . . . '(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'"  *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006)).  But make out a prima facie case, plaintiff cannot.  The court concludes a reasonable jury couldn't find prima facie retaliation for two reasons:  (1) plaintiff didn't engage in protected activity; and (2) plaintiff didn't suffer a materially adverse employment action.

27

### A. Protected Activity

"Protected activity for the purposes of Title VII retaliation includes either (1) participating in or initiating a Title VII proceeding or (2) opposing discrimination made unlawful by Title VII." *Kincaid v. Unified Sch. Dist. No. 500*, 645 F. Supp. 3d 1134, 1154 (D. Kan. 2022) (quotation cleaned up), *aff'd*, 94 F.4th 936 (10th Cir. 2024). Plaintiff doesn't allege that she participated in or initiated Title VII proceedings. *See* Doc. 36 at 22–23. So, plaintiff must rely on opposing discrimination made unlawful by Title VII. "Opposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a 'practice made an unlawful employment practice by [Title VII].'" *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002) (quoting 42 U.S.C. § 2000e-3(a)). "General complaints" won't do. *Kincaid*, 645 F. Supp. 3d at 1155 (quoting *Hinds*, 523 F.3d at 1203); *see also Petersen*, 301 F.3d at 1188 ("[A]n employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII.").

Here, "summary judgment is appropriate because it is not remotely clear from the evidence that plaintiff, in the course of" filing her grievance or complaining of harassment, "conveyed to defendant a concern that the employer has engaged in a practice made unlawful by Title VII." *Kindcaid*, 645 F. Supp. 3d at 1155 (quotation cleaned up). Plaintiff argues that she engaged in two forms of protected activity: (1) her February 2022 email; and (2) her March 2022 grievance. Doc. 36 at 22.[13] Neither activity is protected by Title VII.

---

[13]  In the fact section of her response brief, plaintiff asserts that her December 2021 resignation email alleged impermissible discrimination. Doc. 36 at 3. But plaintiff never argues that her resignation email was protected Title VII activity. Doc. 36 at 22–23. Likewise, plaintiff doesn't argue that her discussions with defendant's EEO employee, Ms. Chmidling, were protected activities. So, the court doesn't consider whether those interactions qualify as protected Title VII activites. *Id. See Perry*, 199 F.3d at 1141 n.13 (explaining that the court "will not craft a party's arguments" for it).

Start with the February 2022 email.  In this email, plaintiff complains about Captain Perez calling HR and requesting that an HR employee inform plaintiff that she could receive an unauthorized absence until she returned.  Doc. 35-10 at 1 (Def. Ex. 9).  Plaintiff accuses Captain Perez of "inappropriate, unprofessional, and illegal" behavior.  *Id.*  She also accuses him of "harass[ing]" her and reiterates her concerns that Captain Perez's actions were "against policy" and "rude, disrespectful, and unprofessional at its highest level."  *Id.*  What plaintiff's email doesn't do, however, is accuse Captain Perez or any other employee of defendant of discriminating against her on the basis of sex.  And plaintiff conceded as much when defendant deposed her.  Doc. 36-10 at 13 (Pearson Dep. 165:11–14).  Without that accusation, plaintiff's argument withers.  A "vague reference to discrimination and harassment without any indication that this misconduct was motivated by [sex] (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim."  *Anderson v. Academy Sch. Dist. 20*, 122 F. App'x 912, 916 (10th Cir. 2004); *see also Boliere v. Robert Brodgen's Olathe Buick-GMC Inc.*, 706 F. Supp. 3d 1275, 1296 (D. Kan. 2023) ("[G]eneral statements about 'discrimination' and 'retaliation' are not the sort of complaints that would convey to Defendant that Defendant has 'engaged in a practice made unlawful by' the anti-discrimination laws.  These are generalized grievances that do not support a retaliation claim.").  A reasonable jury thus couldn't find protected activity premised on plaintiff's email.

Plaintiff's March 2022 grievance suffers many of the same shortcomings.  In this handwritten form, plaintiff describes her version of defendant removing her from the compound.  Doc. 36-7 at 1–2 (Pl. Ex. 6).  In the "Requested Remedy" section of the grievance form, plaintiff wrote, "Quit harassing me."  *Id.* at 1 (Pl. Ex. 6).  Plaintiff also wrote this excerpt about Captain Perez treating her differently than a coworker:

> Alli has the bus today, but he was on the compound this morning too, He also
> wrote a grievance on Perez for the same things I did.  Was he also told not to be
> on the compound?  He passed the captain['s] office just like I did.

*Id.*  Like the February 2022 letter, this email fails to put defendant "on notice that [plaintiff] was

complaining about discrimination under federal, state, or city law." *Cardwell v. Davis Polk &*

*Wardwell LLP*, No. 19-CV-10256-GHW, 2021 WL 4434935, at *30 (S.D.N.Y. Sept. 23, 2021);

*see also Rodas v. Town of Farmington*, 918 F. Supp. 2d 183, 189 (W.D.N.Y. 2013) ("[T]he

plaintiff must complain of discrimination in sufficiently specific terms to put the employer on

notice that the plaintiff believes he or she is being discriminated against on the basis of race,

gender, national origin, or any other characteristic protected by Title VII." (citations omitted)),

*aff'd*, 567 F. App'x 24 (2d Cir. 2014).  Plaintiff's March grievance form doesn't refer to

plaintiff's gender or sex, so it didn't put defendant on notice that plaintiff believed defendant had

discriminated against her in violation of Title VII.

Undeterred, plaintiff argues that her comparison to another male employee, Ali Shawki,

sufficed to qualify her grievance as a form of protected activity.  Doc. 36 at 23.  She's right about

one thing.  The grievance form questions why Captain Perez treated plaintiff differently than Mr.

Shawki.  Doc. 36-7 at 1 (Pl. Ex. 6).  But that question—at best—makes a generalized accusation

that defendant treated plaintiff unfairly.  And courts consistently have refused to treat such a

complaint as protected Title VII activity.  *E.g.*, *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp.

3d 99, 124 (S.D.N.Y. 2020) ("Mere complaints of unfair treatment are not protected speech in

the employment retaliation context, and the onus is on the speaker to clarify to the employer that

he is complaining of unfair treatment due to his membership in a protected class and that he is

not complaining merely of unfair treatment generally." (quotation cleaned up)); *Overfield v.*

*Kansas*, 660 F. Supp. 3d 1101, 1113 (D. Kan. 2023) ("A complaint about unfair treatment in

general is not 'protected opposition to discrimination unless the basis for the alleged unfair

treatment is some form of unlawful discrimination in violation of Title VII.'" (quoting *Faragalla v. Douglas Cnty. Sch. Dist. RE 1*, 411 F. App'x 140, 148 (10th Cir. 2011))); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000) ("Title VII does *not* make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal.  It prohibits only intentional discrimination *based upon* an employee's protected class characteristics." (emphasis in original)).  Without a mention of sex— or any other protected Title VII class—plaintiff's grievance form didn't communicate her "concern that her employer had engaged in a practice made unlawful by Title VII." *Kincaid*, 645 F. Supp. 3d at 1155 (internal quotation marks and citation omitted).  In short, plaintiff hasn't raised a triable issue that she engaged in any protected activity.

Absent this element, plaintiff can't make out a prima facie case for Title VII retaliation. So the court grants summary judgment against this claim.  But even if plaintiff had engaged in protected activity, her claim still would fail because no reasonable jury could find that plaintiff sustained a materially adverse employment action, as the court explains, next.

### B.    Materially Adverse Employment Action

Recall that the second element of a prima facie retaliation claim requires "that a reasonable employee would have found the challenged action materially adverse[.]" *Kincaid*, 645 F. Supp. 3d at 1150.  The test for a *materially* adverse employment action—applied to a Title VII retaliation claim—differs from the test for an adverse employment action—applied to a Title VII discrimination claim.  *Muldrow*, 601 U.S. at 357–58.  "[A]n action is 'materially adverse' if it is sufficiently severe or pervasive that it could well dissuade a reasonable worker from engaging in protected activity." *Kincaid*, 645 F. Supp. 3d at 1162 (quotation cleaned up). "[P]etty slights, minor annoyances, and simple lack of good manners" don't qualify as materially adverse employment actions.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006).  After all, these are the sort of "ordinary tribulations" "that often take place at work and that all employees experience."  *Id.*; *see also Somoza*, 513 F.3d at 1212 ("The Court [in *Burlington Northern*] focused on the term 'materially adverse' in order to separate trivial harms from actionable injuries because Title VII does not establish 'a general civility code for the American workplace.'" (quoting *Oncale*, 523 U.S. at 80)).

Giving plaintiff's brief a generous reading, the court finds three arguments for materially adverse employment actions:  (1) Captain Perez ordered plaintiff off the compound; (2) defendant didn't investigate plaintiff's allegations of harassment against Captain Perez; and (3) defendant constructively transferred plaintiff involuntarily. Doc. 36 at 23–25.  None of these actions qualifies as a materially adverse employment action.  The court explains, starting with Captain Perez ordering plaintiff off the compound.

## 1.  Removal from Compound

Plaintiff's first argument is that the removal-from-the-compound incident qualifies as a materially adverse employment action.  *Id.* at 23–24.  Plaintiff argues that defendant ordered her off the compound and that no one told her she could return.  *Id.* at 24.  And so, plaintiff didn't return to the compound for about two weeks.  *Id.* at 17.  During that time, she "felt humiliated" and used eight hours of vacation time when she had nothing to do.  *Id.*; Doc. 36-10 at 12 (Pearson Dep. 147:15–22).  This situation doesn't constitute a materially adverse employment action.  Here's a quick reminder of the summary judgment facts relevant to plaintiff's argument:

- CSI Hollister—at Captain Perez's direction—told plaintiff that Captain Perez didn't want her on the compound.  Doc. 35-11 at 1 (Def. Ex. 10); Doc. 35-17 at 39 (Pearson Dep. 140:10–11) ("Bruce Hollister told me Captain Perez did not want me on the compound.").

- There's no evidence that defendant subjected plaintiff to a *durational* ban from the compound.[14]  But plaintiff subjectively understood the order as an indefinite removal from the compound.  Doc. 35-17 at 39 (Pearson Dep. 140:3–15).
- Even after these events, plaintiff still went to the compound.  Doc. 35-16 at 1 (Def. Ex. 15).  Plaintiff swiped into the compound with her ID card twice on the day after the removal order.  *Id.*  And plaintiff doesn't allege that defendant reprimanded her for reentry.
- During the two-week period plaintiff thought she couldn't go on the compound, she still ran many transportation trips for her employer.  Doc. 35-17 at 40 (Pearson Dep. 141:14–18).

Based on these facts, the court isn't convinced that a reasonable jury could find a materially adverse employment action.

The premise of plaintiff's argument can't pass muster.  An employer directing its employee to do something within the confines of the employee's job—and without more—isn't a materially adverse employment action, even if the employee doesn't like it.  *See Unal v. Los Alamos Pub. Schs.*, 638 F. App'x 729, 743–45 (10th Cir. 2016) (requiring "negative consequences beyond mere inconveniences" for a materially adverse employment action and concluding that workspace relocation of employee didn't satisfy that standard).  That is, a supervisor telling an employee what to do wouldn't deter a reasonable worker from engaging in protected activity.

What's more, plaintiff's alleged injuries—humiliation and use of vacation time—are self-inflicted.  And self-inflicted injuries won't do.  Plaintiff's only explanation for why she suffered humiliation or used vacation time is her subjective interpretation of defendant's orders, unsupported by any objective evidence that defendant actually commanded plaintiff off the

---

[14]  Plaintiff's briefing practically concedes that she was incorrect in believing that defendant had banned her from the compound.  *See* Doc. 36 at 17 ("KDOC's failure to inform Pearson left her believing rightly or *wrongly* for approximately 2 weeks that she was not permitted to enter the compound resulting in her at times spending hours on end in her car wondering if she had any tasks to perform." (emphasis added)).  Regardless, plaintiff hasn't adduced any evidence that defendant banned her from the compound for two weeks other than plaintiff's own subjective understanding of the situation.

compound for any duration of time.  *See Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009) (explaining that standard is "an objective inquiry" and "each case 'is judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'" (quoting *Burlington N.*, 548 U.S. at 71)).  Given that plaintiff successfully swiped into the compound and entered twice the day after the event she construed as a durational expulsion, defendant's actions wouldn't dissuade a reasonable worker from engaging in protected activity because a reasonable worker wouldn't interpret defendant's actions as banning plaintiff from the compound for any substantial period of time.  And as the Supreme Court explained, "a plaintiff's unusual subjective feelings" can't suffice to establish a materially adverse employment action. *Burlington N.*, 548 U.S. at 68–69.

And even if defendant had ordered plaintiff off the compound, a reasonable jury still couldn't find a materially adverse employment action.  Removal from the compound represents a "mere inconvenience or an alteration of job responsibilities," which won't do.  *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1239 (10th Cir. 2004) (quotation cleaned up).  And our Circuit has made plain that, ordinarily, only a "significant change in employment status or benefits" can constitute a materially adverse employment action.[15]  *Brown*, 13 F.4th at 1090.  Here, even if plaintiff could adduce objective evidence that defendant removed her from the compound for two weeks—she hasn't—no reasonable jury could find that direction a significant change as opposed to a mere alteration of plaintiff's job.  In short, plaintiff has failed to create a triable issue on whether her removal from the compound is a materially adverse employment action.

---

[15]     The court retains the significance modifier because this analysis occurs in the retaliation context. *Muldrow* explicitly declined to extend its more standard—*i.e.*, "some harm"—to the retaliation context because of "reasons peculiar" to that context.  601 U.S. at 357.  This Order follows suit.

### 2. Failure to Investigate

Plaintiff's second allegation likewise doesn't qualify as a materially adverse employment action. Plaintiff argues that defendant's "complete failure to investigate her two complaints was retaliatory." Doc. 36 at 24. Plaintiff cites no authority for her argument.

The Tenth Circuit addressed a similar issue in *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620 (10th Cir. 2012), *abrogated on other grounds by Muldrow*, 601 U.S. 346. There, plaintiff alleged that UPS's failure to investigate an internal discrimination complaint plaintiff had filed was a materially adverse employment action. *Id.* at 640. Affirming the district court's order granting summary judgment, our Circuit rejected that argument. *Id.* at 640–41. It explained that "a failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed." *Id.* at 640 (citing *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721–22 (2d Cir. 2010)). "[A]dopting a contrary rule and finding a failure to investigate establishes a prima facie case of retaliation would open employers to retaliation claims even where they failed to investigate because of a good faith belief the complaint was meritless." *Id.* (citing *Fincher*, 604 F.3d at 721–22). And since *Daniels*, district courts in our Circuit routinely have held that failing to investigate—at least where plaintiff alleges no follow-on harm—doesn't constitute as a retaliatory adverse employment action. *E.g.*, *Rains v. Westminster Coll.*, No. 20-CV-00520, 2024 WL 3608226, at *21 (D. Utah July 8, 2024) ("[T]here is no reason to think a failure to investigate would dissuade a reasonable employee from reporting discrimination. . . . [Plaintiff's] retaliation-by-failing-to-investigate theory . . . . fails as a matter of law."); *Haws v. Draper City*, No. 20-cv-00091-JNP-DBP, 2023 WL 2599956, at *9 (D. Utah Mar. 22, 2023) ("Defendants' failure to investigate was not adverse to [plaintiff's] employment."); *VonLintel v. Eagle Commc'ns, Inc.*, No. 14-4125-KHV, 2016 WL 7179465, at *13 (D. Kan. Dec. 9, 2016) (holding that plaintiff failed to raise

"genuine issue of material fact whether [defendant's] failure to investigate by itself might dissuade a reasonable worker from raising a discrimination claim"); *Clayton v. Dreamstyle Remodeling of Colo., LLC*, No. 20-CV-02096-KLM, 2022 WL 910957, at *18 (D. Colo. Mar. 28, 2022) (compiling cases).

Recall once more that it's undisputed:  defendant investigated plaintiff's grievances. *E.g.*, Doc. 35-20 at 3 (Skidmore Dep. 23:17–24); Doc. 35-21 at 2 (Hrabe Dep. 11:15–25); Doc. 35-7 (Def. Ex. 6); Doc. 35-19 at 10, 11 (Norton Dep. 35:4–5, 39:2–11).[16]  So, again, plaintiff's argument is weaker than the argument that courts have rejected in the litany of cases cited above. Like the *Daniels* plaintiff, plaintiff here does not explain how defendant's investigation—no matter how inadequate it was—"made it more difficult for her to pursue her claims with the EEOC or otherwise assert her rights."  *Daniels*, 701 F.3d at 640–41.  Nor does plaintiff "allege she suffered any other harm from [defendant's] failure to investigate her internal complaint[s]." *Id.* at 641.  Without explaining *how* defendant's investigation into plaintiff's complaints adversely affected her, plaintiff's claim fails.  No reasonable factfinder could decide differently.

This conclusion leaves just one last argument:  plaintiff's constructive involuntary transfer argument.

### 3.  Constructive Involuntary Transfer

Plaintiff advances one final argument for a materially adverse employment action.  She asserts that defendant's failure to act compelled her to transfer posts.  Doc. 36 at 25.  Once more, plaintiff cites zero authority to support this argument.  *Id.*  And once more, the court is unpersuaded that a reasonable jury could adopt plaintiff's position.  Plaintiff presents this

---

[16]     Plaintiff's brief refers to defendant's "complete failure to investigate her two complaints[.]"  Doc. 36 at 24.  But plaintiff never cites any factual support for this argument.  Once more, the summary judgment record explicitly and without conflict debunks this assertion.  *See above* n.12.

argument in cursory fashion, devoting a single sentence to it. So the court could reject plaintiff's

constructive involuntary transfer argument on that basis alone. *Moya*, 5 F.4th at 1192

(explaining that litigants waive arguments "when they are inadequately presented" (quotation

cleaned up)). And evaluating this argument on the merits wouldn't alter the court's conclusion.

The court already has considered this argument. *See above* § V.A. Nothing defendant did

rendered plaintiff's employment "objectively intolerable[.]" *Hiatt*, 858 F.3d at 1318. So, a

reasonable jury couldn't find that plaintiff suffered a constructive involuntary transfer or any

other materially adverse employment action.[17]

### C.    Retaliation Conclusion

Plaintiff fails to present a prima facie case for Title VII retaliation for two reasons. She

fails to create a triable issue that she either engaged in protected activity or sustained a materially

adverse employment action. Because plaintiff has failed to make out a prima facie case—the

first step of the *McDonnell Douglas* framework—the court needn't proceed further. *Hinds*, 523

F.3d at 1202 n.12 ("[I]f an employee fails to present even the limited quantum of evidence

necessary to raise a prima facie inference that his or her protected activity led to an adverse

employment action, it can become pointless to go through the motions of the remainder of the

*McDonnell Douglas* framework to determine that unlawful retaliation was not at play."). And

the court thus grants defendant summary judgment on plaintiff's Title VII retaliation claim.

---

[17]      As the court explained, the standard for an adverse employment action (for a Title VII
discrimination claim) isn't the same as the standard for a materially adverse employment action (for a
Title VII retaliation claim). *Muldrow*, 601 U.S. at 357–58. But the standard to establish constructive
discharge—which the court imports for its constructive involuntary transfer analysis, *see* § V.A.—is the
same no matter whether it's used to support an adverse employment action or a materially adverse
employment action. *See Mitchell v. Zia Park, LLC*, 842 F. Supp. 2d 1316, 1329 (D.N.M. 2012) (applying
the "objectively intolerable" standard for a Title VII retaliation claim premised on constructive
discharge). So the court's conclusion—discussed above with respect to the Title VII discrimination
claim—controls here.

VII.    **Kansas Act Against Discrimination (KAAD) Claims (Counts III and IV)**

A.  **Supplemental Jurisdiction**

Under 28 U.S.C. § 1367(c)(3), the court may decline to exercise supplemental jurisdiction over state law claims if it has "dismissed all claims over which it has original jurisdiction[.]"  Section 1367 "reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  In "the usual case" when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.

Our Circuit has emphasized the point.  It prefers that when a district court dismisses all federal claims, it typically should decline to exercise supplemental jurisdiction over state law claims.  *See I Dig Texas, LLC v. Creager*, 98 F.4th 998, 1012 (10th Cir. 2024) ("The 'district court should normally dismiss supplemental state law claims after all federal claims have been dismissed, particularly when the federal claims are dismissed before trial.'" (quoting *Foxfield Villa. Assocs., LLC v. Robben*, 967 F.3d 1082, 1103 (10th Cir. 2020))).  But still, the decision is committed to the district court's sound discretion.  *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

Here, there's nothing efficient about relinquishing jurisdiction over plaintiff's KAAD claims so that a Kansas state court could re-invent and re-apply the same analysis applied here to plaintiff's federal claims.  The court thus exercises its discretion and retains supplemental

jurisdiction.  Because plaintiff's KAAD claims require the same analysis as plaintiff's Title VII

claims, retaining jurisdiction over plaintiff's state law claims promotes judicial economy and

convenience.  *See Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7.  So, the court retains jurisdiction

over plaintiff's KAAD claims and addresses those claims, next.

### B.    Disposition

Courts apply the same analysis to KAAD claims as Title VII claims.  *Singh v. Cordle*,

936 F.3d 1022, 1037 (10th Cir. 2019) ("[W]e apply the same analysis to the Title VII and KAAD

claims."); *Fugett v. Sec. Trans. Servs., Inc.*, 147 F. Supp. 3d 1216, 1229 n.37 (D. Kan. 2015).

The parties agree on this point.  Doc. 35 at 30; Doc. 36 at 26.  Because plaintiff has failed to

present triable issues on her Title VII discrimination and retaliation claims, she likewise has

failed to present triable issues on her KAAD discrimination and retaliation claims.  The court

thus grants summary judgment against plaintiff's KAAD claims.

## VIII.    Conclusion

A reasonable jury couldn't find that plaintiff sustained an adverse employment action.

And even if plaintiff had sustained an adverse employment action, a reasonable factfinder

couldn't find that it happened under circumstances giving rise to an inference of discrimination.

So defendant is entitled to summary judgment against plaintiff's Title VII discrimination claim.

Similarly, a reasonable jury couldn't find that plaintiff engaged in protected activity or sustained

a materially adverse employment action.  The court thus grants summary judgment against

plaintiff's Title VII retaliation claim.  And because the court employs the same analysis for

KAAD claims as Title VII, the court also grants summary judgment against plaintiff's KAAD

claims.  The court directs the Clerk to enter Judgment consistent with this Memorandum and

Order and close this case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Kansas

Department of Corrections' Motion for Summary Judgment (Doc. 35) is granted.

**IT IS SO ORDERED.**

**Dated this 3rd day of December 2024, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
